### In re MILLER.

(Circuit Court of Appeals, Second Circuit. March 10, 1914.)

No. 159.

1. BANKRUPTCY (§ 414*)—OBJECTIONS TO DISCHARGE—BURDEN OF PROOF.

Creditors objecting to a bankrupt's discharge had the burden of proving the alleged concealment of property and failure to keep books with intent to conceal his condition, and a discharge should not be refused on suspicion unless the objections were sustained by evidence satisfactory to the court.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 720–722; Dec. Dig. § 414.*]

2. BANKRUPTCY (§ 408*)—REFUSAL OF DISCHARGE—FAILURE TO ACCOUNT FOR ASSETS.

Where a bankrupt four years before bankruptcy sold his business to a creditor for the amount of the indebtedness and $385 in cash and thereafter worked on a salary of $10 or $15 a week, being out of employment a part of the time, his failure to account for such $385 did not justify the refusal of a discharge, as it was reasonable to assume that he spent it for his support.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 732–736, 759, 762, 763; Dec. Dig. § 408.*]

3. BANKRUPTCY (§ 408*)—REFUSAL OF DISCHARGE—FAILURE TO ACCOUNT FOR ASSETS.

That a bankrupt's sister, who some time prior to the bankruptcy engaged in the same business in which the bankrupt had been engaged, did not conduct the business herself, but employed the bankrupt on a salary, did not indicate that the bankrupt was in fact carrying on the business in his sister's name, in the absence of any showing that he shared in the profits.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 732–736, 759, 762, 763; Dec. Dig. § 408.*]

4. BANKRUPTCY (§ 408*)—REFUSAL OF DISCHARGE—FAILURE TO ACCOUNT FOR ASSETS.

Where a bankrupt's sister prior to the bankruptcy, having $600 to $700, engaged in the business in which the bankrupt was formerly engaged, of purchasing photographers' used plates, cleaning them, and reselling them, the sale of the business over two years thereafter for $1,750 did not show

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that the bankrupt was in fact carrying on the business in her name, as the profits, if not spent, might have aggregated $400 in a year.

[Ed. Note.—For other caess, see Bankruptcy, Cent. Dig. §§ 732–736, 759, 762, 763; Dec. Dig. § 408.*]

Coxe, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of New York.

This cause comes here on appeal from a decree of the District Court, Eastern District of New York, denying the application of the bankrupt for a discharge. The opinion of the District Judge will be found in 203 Fed. 170. Reversed.

A. Cohen, of New York City, for appellant.

J. M. Hickey, for appellee.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge. [1] The grounds of objection to discharge are alleged concealment of property and a failure to keep books of account with intent to conceal his condition. The burden of proof is on the objecting creditors; the court must be satisfied by evidence that the objections are sustained. A discharge should not be refused, when the evidence fails to support the averments, merely because some of the proof "looks suspicious."

Miller was adjudicated a voluntary bankrupt on May 22, 1911. The schedules are not before us, but from the opinion of the District Judge it appears that the only debts of any importance are two promissory notes which he made to Goldberg & Rathers of Boston. One of these was put in evidence, dated July 9, 1907, for $1,846.15 payable in 4 months and indorsed to the objecting creditor.

[2] The bankrupt from 1902 to 1907 was in business for himself under the name of the "Brooklyn Glass Works," having filed the statutory certificate authorizing his doing business under that title. The business consisted in purchasing photographers' used glass plates, cleaning them with hot water and lye, and selling them when cleaned to framers. He made the purchases and sales, going himself from place to place, and hiring a man to clean them. It was a small business conducted on a cash basis and manifestly did not require any elaborate bookkeeping—a memorandum book and a bank account would be all that was necessary. Rathers was an old friend of his. He loaned him money when he could, and later signed notes to him (or rather to his firm) as an accommodation, which were always cared for by the payee and gave him no trouble. In September, 1907 (which was the year of the panic) the accommodation note above referred to was outstanding, not due till November. He also owed $700 to a man named Fineberg, who was in the milk business, and was pressing him for payment. In order to pay Fineberg, he sold him his business with all its assets for $1,085. Fineberg paid him with checks, two for $350 each, one for $385. The two $350 checks he indorsed and delivered back to Fineberg; the $385 he kept. Fineberg took over all there was,

some trumpery fixtures—there was no lease, Miller occupying his premises on a monthly tenancy—and all the glass, enumerated in a bill of sale. Fineberg did not carry on the business, but eventually got back his money from selling the glass. Fineberg testifies to this, and there is no apparent reason for doubting his account of his transactions with Miller. So far as we can see, the old business and all its assets, apparently all the property Miller owned, was disposed of fairly for a valuable consideration. The District Judge was of the opinion that the bankrupt had failed to account for the $385. According to the bankrupt's testimony from that time to the present he has been working on a salary (at first of $15, afterwards of $10, a week), and for part of the time he was out of employment. It is reasonable to assume that he spent the money for his support during the four years.

[3] This transaction left Miller without remunerative occupation. He had a sister who had saved $600 to $700. She, we may presume at his suggestion, decided to go into the same sort of business he had been engaged in for several years. She took out a certificate for doing business as the Williamsburg Glass Works and put her money into it, employing him to conduct the business on a salary of $15 a week and another man to clean the plates. There is certainly nothing novel, or startling, or necessarily suspicious about this. Countless men, who have gone broke, have had wives, or mothers or blood relatives who have done the same thing for them. Believing the experience and business enterprise of their relative would make their capital fruitful enough to insure him a living wage and possibly an additional profit for themselves, they have taken the risk. Sometimes, no doubt, the arrangement is merely a cover under which the person thus accommodated himself shares in the profits beyond his salary, but the ostensible arrangement is such a natural one that there must be some proof to indicate that it is a mere cover for something else. It is not sufficient proof of that, as the petitioning creditor seems to contend, that the female does not herself conduct the business about which she knows little or nothing. The vital question is who gets the profits and there is nothing in this record to indicate that during the two years that the "Williamsburg Glass Works" continued, Miller drew anything from it except his weekly salary.

[4] After two years and a half Yetta Miller, the sister, sold out the business to Louis Miller, a brother of the bankrupt, who is not on good terms with him, for $1,750. Louis was also in the same sort of business, and since his purchase in 1910 has continued the business which he bought from his sister. The District Judge refers to this "Williamsburg" business as having grown from nothing to $1,750 in a little over two years. But it did not grow from nothing; it started with Yetta's $600 or $700. If she did not spend the profits as they came in, it is not suspicious that they aggregated $400 a year.

A few months after she sold out, the sister, who had in the meantime married, again started a glass business, under certificate as the North Side Glass Works, and employed her brother, the bankrupt, to conduct it on a salary of $10 a week. We find nothing in the record

which will warrant the finding that this business is really Isaac Miller's; she keeps an account in the North Side Bank of Brooklyn in her own name and signs the checks. Except that she can sign her name, she cannot read or write. She produced the only book kept for the business, a sort of memorandum book, apparently all that that sort of business required—as to its contents we are not enlightened. Nor is there anything to show that checks for more than his salary and the money necessary to buy glass were given to the bankrupt.

On the whole case, we concur with the special commissioner in the conclusion that, although there may be a strong suspicion that the bankrupt has been himself conducting business under the three successive corporate names, there is not sufficient proof to offset the testimony of the sister and brother and to prove the business still belongs to the bankrupt. The decree is reversed.

COXE, Circuit Judge, dissents.